## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

CHRISTOPHER FICCA,                    :
                                      :
              Plaintiff               :        No. 4:11-CV-1521
                                      :
       v.                             :        (Judge Nealon)
                                      :
MICHAEL J. ASTRUE,                    :
COMMISSIONER OF SOCIAL                :
SECURITY,                             :
                                      :
              Defendant               :

FILED
SCRANTON

SEP 2 7 2012

PER _____
          DEPUTY CLERK

## MEMORANDUM

### Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Christopher Ficca's claim for social security disability insurance benefits.

Ficca protectively filed an application for disability insurance benefits in March, 2009, alleging disability since September 1, 2005. (Tr. 72, 128-29). He alleged disability due to status post C6-C7 fusion, right shoulder rotator cuff tendinitis/ partial tear, degenerative disc disease, panic disorder, and attention deficit hyperactivity disorder ("ADHD"). (Doc. 1, ¶ 7), (Tr. 14-15).

On July 8, 2009, the Bureau of Disability Determination denied Ficca's application. (Tr. 102-06). On September 24, 2009, Ficca requested a hearing before an administrative law judge. (Tr. 109-10). A hearing was held on August 2, 2010, before administrative law judge Ronald Sweeda. (Tr. 65-93). On September 21, 2010, the administrative law judge issued a decision denying Ficca's application. (Tr. 9-25). Ficca then requested that the Appeals Council review

the administrative law judge's decision. (Tr. 7). On June 21, 2011, the Appeals Council denied Ficca's request for review. (Tr. 1-5). Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Ficca then filed a complaint in this Court on August 16, 2011. (Doc. 1). Supporting and opposing briefs were submitted and the appeal is now ripe for disposition. (Docs. 8, 9). For the reasons set forth below, the decision of the Commissioner denying Ficca's application for disability insurance benefits will be affirmed.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." Ficca meets the insured status requirements of the Social Security Act through December 31, 2010. (Tr. 14).

Ficca was born on June 21, 1965, and at all times relevant to this matter was considered a "[y]ounger person"[1] whose age does not seriously affect his ability to adjust to other work. 20 C.F.R. § 404.1563(c); (Tr. 23, 71). Ficca has a college degree. (Tr. 72). He has past relevant work experience as a tax office supervisor and an owner of a bowling alley with bookkeeping duties. (Tr. 14, 88). Ficca worked after his alleged onset date; however, the ALJ determined that such work did not amount to substantial gainful activity. (Tr. 72). Ficca stated that he cannot work due to pain in his neck that shoots down to his arm causing numbness, headaches, weakness in his right side, and he also suffers from mental problems. (Tr. 73).

_____

1. The Social Security regulations state that a person age fifty (50) or younger is classified as "[y]ounger person." 20 C.F.R. § 404.1563(c).

**Standard of Review**

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a

3

preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).


**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

4

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work. For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and

supplemental security income claims. See 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920;

Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is

severe or a combination of impairments that are severe, (3) has an impairment or combination of

impairments that meet(s) or equal(s) the requirements of a listed impairment, (4) has the residual

functional capacity to return to his or her past work and (5) if not, whether he or she can perform

other work in the national economy. Id.

In the present matter, the administrative law judge proceeded through the sequential

evaluation process and determined that Ficca was not disabled. At step one, the ALJ found that

Ficca had not engaged in substantial gainful activity since September 1, 2005, the alleged onset

date. (Tr. 14). At step two, the ALJ found that Ficca had the severe impairments of status post

C6-C7 fusion, right shoulder rotator cuff tendinitis/ partial tear, degenerative disc disease, panic

disorder, and attention deficit hyperactivity disorder. (Tr. 14-15). The ALJ then determined, at step three, that Ficca's impairments did not meet or equal a listed impairment, either singly or in combination. (Tr. 15-16). The ALJ proceeded to step four and found that Ficca is unable to perform any of his past relevant work. (Tr. 23). At step five, the ALJ determined that Ficca is capable of performing a significant number of jobs in the national economy. (Tr. 24). The ALJ therefore concluded that Ficca has not been under a disability at any time since his alleged onset date. (Tr. 24-25).

**Medical Evidence**

In 2003, Ficca treated with Brent A. Smith, M.D. (Tr. 291-99). Ficca complained of wrist discomfort, rib discomfort and bipolar disorder. (Tr. 291). In 2004, Ficca had complaints of back pain. (Tr. 291-93).

Ficca began treating at Philhaven Hospital in 2003 for mental and emotional problems. (Tr. 609-29). In 2003, he was initially diagnosed with bipolar II disorder, alcohol abuse, psychosocial and environmental problems, work stress and was assessed a Global Assessment of Functioning ("GAF") score of 55.[2] (Tr. 629).

A May 24, 2004 MRI of Ficca's lumbar spine was within normal limits. (Tr. 185). On May 25, 2004, Dr. Smith noted that the MRI of Ficca's back was normal. (Tr. 295). Dr. Smith

_____

2. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. Diagnostic and Statistical Manual of Mental Disorders 3–32 (4th ed. 1994). A GAF score of 51-60 indicates moderate symptoms or any moderate difficulty in social, occupational, or school functioning.

recommended physical therapy and a home exercise program. (Tr. 295).

On October 11, 2004, Ficca went to see Dr. Smith after he hurt his arm. (Tr. 296). Dr. Smith prescribed Celebrex and referred him to an orthopaedist. (Tr. 296-97).

In March 2005, Ficca complained to Dr. Smith of severe fatigue. (Tr. 299). Dr. Smith noted that Ficca was working a lot and was stressed. (Tr. 298-99).

On May 18, 2005, Ficca attended one day of a partial hospitalization program due to increased agitation, depression, anxiety and racing thoughts. (Tr. 362-63). He was diagnosed with bipolar disorder, personality disorder, it was noted that he was unable to work the previous few weeks and that he was in a motor vehicle accident, and he was assessed a GAF score of 40.[3] (Tr. 362). Ficca was discharged against medical advice due to noncompliance with treatment after four days of not attending. (Tr. 363).

On July 20, 2005, Ficca was examined by David W. Heeter, D.O. (Tr. 300-02). Dr. Heeter noted that Ficca appeared healthy and well developed. (Tr. 300). He noted that Ficca needed to get more sleep and cut back on stimulants, he ordered a stress test, and diagnosed malaise and fatigue, and high cholesterol. (Tr. 301).

On June 9, 2006, Ficca was admitted to the hospital after being found on the floor in his home. (Tr. 364-88). He had head lacerations, a closed head injury and subarachnoid hemorrhage. (Tr. 364).

In July, 2006, Ficca returned for a follow-up visit after the fall in his home. (Tr. 384-85).

---

3. A GAF score of 31-40 indicates some impairment in reality testing or communication OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition.

Ficca reported that his occasional headaches had improved, he was very tired and he had no weakness. (Tr. 384). Ficca's examination was normal and he was directed to return on an as-needed basis. (Tr. 384).

On December 29, 2006, Ficca's wife took him to the hospital with complaints of substance abuse and suicidal/ homicidal ideation. (Tr. 390-96). Ficca reported that he abused drugs and felt homicidal. (Tr. 396).

Ficca continued to treat with Dr. Heeter in 2007, 2008 and 2009. (Tr. 303-32). Ficca had complaints of depression, trouble sleeping, knee pain, and back pain. (Tr. 303-32).

Gregory Wickey, M.D., examined Ficca in January and February, 2008. (Tr. 202-09). Dr. Wickey summarized Ficca's history. He noted that in December 2007, Ficca was lifting weights at the gym and injured his back. (Tr. 203, 208). In 2003, Ficca fell out of a tree stand. (Tr. 203, 208). Ficca was in a car accident in approximately 1998 and suffered a severe head injury. (Tr. 203, 208). In June 2007, Ficca fell in the shower and hit his head. (Tr. 203, 208). In February 2006, Ficca was robbed and was hit in the head with a pool cue. (Tr. 203, 208). Dr. Wickey noted that Ficca had a right lateral disc herniation at C6-C7. (Tr. 205, 209).

A January 4, 2008 MRI of the cervical spine revealed a moderate right-sided disc herniation at C6-C7. (Tr. 289).

In January, February and March, 2008, Ficca had epidural steroid injections for right lateral disc herniation at C6-C7. (Tr. 200-01, 206, 210-12, 258-87).

On March 27, 2008, Ficca was evaluated by Dr. Kuhlengel for his neck pain. (Tr. 235-38). Dr. Kuhlengel diagnosed a right C7 radiculopathy with disc herniation at C6-C7. (Tr. 237). Dr. Kuhlengel recommended surgery. (Tr. 237-38).

In April 2008, Ficca underwent a C6-C7 anterior cervical diskectomy with removal of herniated nucleus pulposus followed by interbody fusion utilizing frozen allograft and placement of anterior cervical titanium Swift dynamized plating. (Tr. 218-19). An x-ray in April 2008 revealed post-surgical changes. (Tr. 224).

On May 8, 2008, Dr. Kuhlengel noted that overall, Ficca was doing well. (Tr. 233). He advised Ficca that he should limit golfing and that he may be able to do some accounting work if he changed positions frequently. (Tr. 234).

Ficca had an x-ray of his cervical spine on May 8, 2008, which revealed a satisfactory postoperative appearance. (Tr. 223).

A June 2008 x-ray of the cervical spine revealed anterior cervical fusion of C6-C7 with no change since the prior x-ray in May 2008. (Tr. 222).

A June 11, 2008 x-ray of the lumbosacral spine revealed minimal anterior spondylotic spurring, with no other findings and no compression fractures. (Tr. 256). An x-ray of Ficca's pelvis on that same date was normal. (Tr. 257).

On June 18, 2008, Ficca reported to Dr. Kuhlengel that he was "doing well", he did not have the severe arm and shoulder pain he had before his surgery, though he still had some aching in his neck. (Tr. 231). Ficca reported pain in his lower back radiating down his legs. (Tr. 231). Dr. Kuhlengel recommended an MRI. (Tr. 232).

Ficca had an MRI of the lumbar spine on June 30, 2008 which revealed no evidence of focal disc herniation, and mild diffuse concentric disc bulge at L5-S1 causing mild bilateral foraminal narrowing. (Tr. 288).

In August 2008, Ficca underwent a psychiatric evaluation with Dr. Dall. (Tr. 196-98).

9

Dr. Dall diagnosed Ficca with bipolar II disorder, panic disorder, ADHD, and ruled out post traumatic stress disorder. (Tr. 198). She noted a history of back surgery and history of loss of consciousness, and she noted that Ficca was assaulted, he had job uncertainty, medical problems, and assessed a GAF score of 52. (Tr. 198).

Dr. Dall continued to treat Ficca from August 2008 through November 2009. (Tr. 433-).

Also in August 2008, Ficca received counseling services for depression, physical pain, and weight loss. (Tr. 432). Ficca was discharged from treatment because he did not follow through and left prematurely. (Tr. 432).

An x-ray of Ficca's chest on September 15, 2008, revealed no definite evidence for active disease. (Tr. 410). On September 16, 2008, Ficca had a cardiac catheterization due to chest pain and an abnormal ECG. (Tr. 398-409). The catheterization revealed no significant coronary artery disease, normal left ventricular function, no significant valvular heart, and normal left heart filling pressures. (Tr. 402).

In September 2008, Ficca had an x-ray of the cervical spine which revealed normal alignment. (Tr. 221). There was evidence of an anterior surgical fusion at C6-C7, good position of the plate and screws, with flexion and extension the pivot point was at the C5-C6 disk space and motion of the spine was otherwise unremarkable, mild degenerative disk disease at C5-C6 (unchanged from an earlier study), and possibly minimal degenerative change at C4-C5 (unchanged). (Tr. 221).

On September 24, 2008, Ficca had a follow-up visit with Keith R. Kuhlengel, M.D. (Tr. 229). Dr. Kuhlengel noted that Ficca was doing well, although his neck felt stiff at times, but "clearly it is better than it was pre-operatively, and the arm and shoulder discomfort he had has

10

completely dissipated." (Tr. 229). Ficca moved easily from a sitting to standing position, he had good range of motion in the cervical spine and excellent strength in the upper extremities. (Tr. 229). Ficca stated that his back symptoms settled down and were not as bothersome as they were. (Tr. 229).

A November 22, 2008 MRI of Ficca's left knee revealed a probable meniscus tear, mile medial compartment osteoarthritis, a small amount of fluid in the joint and suprapatellar bursa, and Baker's cyst. (Tr. 457).

A November 23, 2008 x-ray of Ficca's left knee was normal. (Tr. 255).

On November 26, 2008, Ficca was evaluated by Donald D. Diverio, Jr., D.O. (Tr. 246-47). Dr. Diverio diagnosed a medial meniscus tear in the left knee, popliteal cyst in the left knee, and effusion of the left knee. (Tr. 247). Dr. Diverio scheduled knee surgery, which was done on December 5, 2008. (Tr. 247-49).

On December 12, 2008, Ficca returned to see Dr. Diverio. (Tr. 245). Dr. Diverio noted that Ficca was "doing quite well." (Tr. 245). Ficca reported that he had marked improvement in his knee and indicated "he is nearly completely better." (Tr. 245). Dr. Diverio noted that Ficca had a tear in his medial meniscus and medial femoral chondtritis in the left knee. (Tr. 245). Dr. Diverio stated that Ficca could resume his normal work duties. (Tr. 245).

In December 2008 and January 2009, Ficca treated with Donald D. Diverio, Jr., D.O., for wrist pain. (Tr. 242-44). Ficca had a ligament tear and distal radioulnar joint degenerative joint disease. (Tr. 242-44). Ficca had MRIs and x-rays of his wrist. (Tr. 251-54). A July 2009 x-ray of Ficca's right wrist revealed degenerative changes with changes suggestive of an old injury. (Tr. 426). A July 2009 x-ray of Ficca's right foot was normal. (Tr. 426).

In April, 2009, Dr. Gall diagnosed Ficca with bipolar II disorder, panic disorder, ADHD, and ruled out post traumatic stress disorder. (Tr. 193-95). She noted a history of back surgery and history of loss of consciousness, and she noted that Ficca was assaulted, he had job uncertainty, medical problems, and assessed a GAF score of 53. (Tr. 193-95).

In May 2009, Anne V. Dall, M.D., completed a Mental Medical Source Statement of Ficca's Ability to do Work-Related Activities. (Tr. 188-90). Dr. Dall found that Ficca had moderate restrictions in the ability to understand, remember, and carry out instructions. (Tr. 189). Dr. Dall determined that he has a slight restriction in the ability to interact appropriately with the public, and moderate restrictions in the ability to interact appropriately with supervisors and co-workers, and moderate restrictions in the ability to respond appropriately to work pressures and changes in a routine work setting. (Tr. 189). He has mood swings and significant anxiety and his impairments may affect his attendance. (Tr. 189-90).

On May 4 and 11, 2009, Dr. Dall diagnosed Ficca with bipolar II disorder, panic disorder, ADHD, and ruled out post traumatic stress disorder. (Tr. 192). She noted a history of back surgery and history of loss of consciousness, and she noted that Ficca was assaulted, he had job uncertainty, medical problems, and assessed GAF scores of 58 and 59. (Tr. 191-92).

Ficca continued to treat with Dr. Dall through 2009 and 2010. (Tr. 514-28). Dr. Dall prescribed medications. The highest GAF score was 60 and the lowest was 53. (Tr. 514-28).

On June 19, 2009, Ficca's wife completed a Disability Function Report. (Tr. 151-60). She stated that Ficca goes through periods of being awake for days, and then sleeping for days. (Tr. 151-52). Ficca sometimes does not shower or dress for days, sometimes he eats a lot and sometimes he doesn't eat at all. (Tr. 152). Ficca does not cook or do household chores, he does

12

not shop or pay bills, his wife has to tell him to bathe, she controls his medication, and he only goes out of the house for doctor's appointments. (Tr. 152-54). Ficca has no interest in activities, he only watches television, and he has no social life. (Tr. 155-56). He can only pay attention for a limited period of time, he cannot follow instructions well, and he does not handle stress or changes in routine. (Tr. 156-57).

On June 27, 2009, Ficca's father completed a Disability Function Report on behalf of his son. (Tr. 161-68). He was unable to answer several questions due to lack of knowledge; however, he did state that Ficca cares for their animals, his wife helps him, and he has no trouble taking care of his own personal needs. (Tr. 161-68).

On July 6, 2009, John Hower, Ph.D., completed a Mental Residual Functional Capacity Assessment. (Tr. 344-47). Dr. Hower found that Ficca was moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform basic activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to set realistic goals or make plans independently of others. (Tr. 344-45). Dr. Hower found that Ficca was not significantly limited in all other areas. (Tr. 344-45). Dr. Hower diagnosed bipolar II, panic disorder, PTSD and ADHD. (Tr. 346). He found that Ficca is capable of performing work on a sustained basis. (Tr. 346).

13

Dr. Hower also completed a Psychiatric Review Technique Form on July 6, 2009 and concluded that a RFC Assessment was necessary and there were coexisting nonmental impairments that required referral to another medical specialty. (Tr. 348-60). Dr. Hower evaluated Ficca's condition under the requirements of Listings 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders). (Tr. 348). Dr. Hower diagnosed ADHD and Bipolar Disorder, NOS. (Tr. 349, 351).

Under the B criteria of the Listings, Dr. Hower found there were mild restrictions of activities of daily living; moderate difficulty in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, or pace; and one or two episodes of decompensation. (Tr. 358). Dr. Hower found that Ficca's impairments did not meet the C criteria of the Listings. (Tr. 359).

On July 7, 2009, Michael Hinton completed a Physical Residual Functional Capacity Assessment. (Tr. 94-101). He noted that the medical evidence establishes that Ficca suffers from degenerative disc disease of the cervical/ lumbar spines. (Tr. 101). He found that Ficca is unable to perform his past relevant work, but he is capable of performing unskilled, light duty work. (Tr. 95).

A July 20, 2009 MRI of the cervical spine revealed status post C6-C7 fusion, straightening of the cervical lordosis, and multilevel degenerative disc disease/ osteoarthritis. (Tr. 461-62).

An MRI of of Ficca's right ankle on July 29, 2009 revealed significant soft tissue swelling, plantar fasciitis, and ligament sprain. (Tr. 464).

On August 6, 2009, Ficca complained of right shoulder pain to Dr. Wickey. (Tr. 489-90).

14

Ficca received a trigger point injection in his right and left trapezius. (Tr. 492).

On August 26, 2009, Ficca underwent an orthopaedic consultation with Dr. Diverio. (Tr. 428). Dr. Diverio noted that Ficca had bilateral upper extremity radiculitis and right shoulder pain. (Tr. 429). An October 5, 2009 EMG of Ficca's right shoulder revealed possible partial tear of the supraspinatus tendon with occasional small areas of increased signal between fibers, minimal fluid in the subdeltoid bursa, and degenerative changes about the AC joint causing mild impingement. (Tr. 429).

A September 29, 2009 examination revealed a rotator cuff strain or partial rupture of the right shoulder. (Tr. 469). An EMG and nerve conduction study showed an abnormal right upper extremity. (Tr. 471-74).

In December 2009, Dr. Wickey examined Ficca and noted chronic right cervical radiculopathy at C5-C6 and degenerative joint disease of the right shoulder. (Tr. 486). Dr. Wickey administered an epidural steroid injection on December 21, 2009. (Tr. 484).

On January 2, 2010, Ficca complained of right hand pain. (Tr. 495-96). An x-ray of the right hand revealed soft tissue swelling but no evidence of underlying acute bone or joint trauma. (Tr. 498-99).

On January 15, 2010, Ficca again treated with Dr. Dall. (Tr. 515). She noted that Ficca was very depressed. (Tr. 515).

On January 22, 2010, Dr. Dall noted that Ficca's affect was much brighter, he denied suicidal thoughts and there were no psychotic symptoms. (Tr. 514).

Dr. Dall continued to treat Ficca from February 2010 through May 2010. (Tr. 557-77). Dr. Dall noted that Ficca's affect was calmer and brighter, he was depressed on certain visits, his

mood was better at times, he had no psychotic symptoms, and he denied suicidal and homicidal thoughts. (Tr. 557-77). On May 18, 2010, Ficca's affect was extremely anxious; however, he refused to go to the hospital. (Tr. 574-75). On May 25, 2010, Ficca's affect was brighter and his thought processes were "remarkably focussed [sic] and organized." (Tr. 576-77).

A March 10, 2010 chest x-ray revealed no focal lung consolidations, and nodular density in the right midchest which may represent a prominent vessel. (Tr. 541). A brain scan on that same date revealed no intracranial hemorrhage. (Tr. 542).

On March 11, 2010, Ficca was evaluated by Donn Tiu Tong, M.D. (Tr. 546-59). Ficca complained of inability to sleep and that he was unable to find his Effexor or Xanax. (Tr. 546). Dr. Tong noted that Ficca was suffering from substance intoxiation/ overdose and that his alcohol intake needed to be monitored as well. (Tr. 548-49).

On March 11, 2010, Ficca underwent a psychiatry consultation with Jeffrey A. Okamoto, M.D. (Tr. 530-31). Dr. Okamoto diagnosed bipolar disorder, NOS, depression, and anxiolytic abuse. (Tr. 531). Dr. Okamoto did not recommend inpatient psychiatric hospitalization. (Tr. 531).

On April 6, 2010, Ficca was treated for rotatory cuff tendinitis/ impingement syndrome of the right shoulder. (Tr. 551-52).

In June 2010, there was suspicion that Ficca was seeking drugs. (Tr. 579).

On June 10, 2010, Ficca complained of right shoulder pain and he received an injection in his shoulder. (Tr. 581-83).

On June 30, 2010, Ficca was evaluated by Christopher L. Schaiberger, M.D. (Tr. 585-86). Dr. Schaiberger opined that Ficca's main problem was a rotator cuff injury. (Tr. 586). An

16

x-ray revealed right shoulder C7 radiculopathy. (Tr. 587-92).

A July 2010 MRI of Ficca's cervical spine revealed post ACDF changes at C6-C7 and mild posterior central disk bulge. (Tr. 596-97).

On January 8, 2010, and March 25, 2010, Dr. Dall wrote letters stating that Ficca was unable to sustain employment. (Tr. 607-08). On July 27, 2010, Dr. Dall wrote a letter stating that Ficca had severe symptoms of depression and anxiety which prevented him from working at that time. (Tr. 606).


## Discussion

Ficca argues that the ALJ erred in determining that he does not have an impairment or combination of impairments that meets or medically equals a listed impairment and that the ALJ erred in determining he has the residual functional capacity to return to the work force. (Doc. 8, pg. 3).

Ficca states that he suffers from status post C6-C7 fusion, right shoulder rotator cuff tendinitis/ partial tear, and degenerative disc disease. (Doc. 8, pg. 4). He also states that he suffers from the mental impairments of panic disorder and attention deficit hyperactivity disorder. (Doc. 8, pg. 4).

Ficca argues that the ALJ erred by not making any findings under Listing Section 1.00, et seq., specifically Listing 1.04A, Disorders of the Spine. (Doc. 8, pgs. 5-6). Ficca bears the burden of presenting "medical findings equivalent in severity to all the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990). To satisfy Listing 1.04A, Ficca had to prove that he had a disorder of the spine, (e.g., herniated nucleus pulposus, spinal

17

arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture) resulting in compromise of a nerve root or the spinal cord, with evidence of nerve root compression characterized by neuro-anatomic distribution of pain; limitation of motion of the spine; motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss; and, if there is involvement of the lower back, with positive straight-leg raising tests in the sitting and supine position. 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04 (2011).[4]

The ALJ stated that he specifically reviewed Section 1.00, et seq. (Tr. 15). The ALJ stated that Ficca's impairments of status post C6-C7 fusion, right shoulder rotator cuff tendinitis/ partial tear, degenerative disc disease, panic disorder and attention deficit hyperactivity disorder were severe. (Tr. 15). However, the ALJ found that they did not meet listing level severity. (Tr. 15).

Ficca states that, after the ALJ hearing, he underwent surgery to repair his rotator cuff, neck surgery has been recommended, and his physicians are considering C4-5 and C5-6 foraminotomy. (Doc. 8, pg. 5). He states that he has been diagnosed with foraminal stenosis at

---

4. Listing 1.04A provides as follows:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1.

C4-5 and C5-6 with compression of the C5 and C6 nerves resulting in weakness in his right arm. (Doc. 8, pg. 6). Ficca notes that Dr. Sather has recommended C4-5 and C5-6 anterior cervical discectomy with fusion and plating. (Doc. 8, pg. 6). He also notes that Dr. Lyons performed rotator cuff repair and that his moderate to severe foraminal stenosis at C5-6 likely caused arm pain and that the rotator cuff surgery would not resolve his symptoms. (Doc. 8, pg. 6). Thus, Ficca argues that he meets Listing 1.04. (Doc. 8, pg. 6).

The Government argues that the ALJ specifically reviewed Listing 1.00, et seq. (Doc. 9, pg. 12). Government counsel notes that Ficca believes his condition meets Listing 1.04A because he had a panic disorder and ADHD, was status post C6-C7 fusion surgery, and had a rotator cuff tear of his right shoulder and degenerative disc disease. (Doc. 8, pg. 4; Doc. 9, pg. 13). However, the Government notes that Ficca did well after his C6-C7 discectomy. (Doc. 9, pg. 13).

Regarding the evidence Ficca submitted after the ALJ hearing, the Government argues that Ficca may not rely on such evidence because it was not presented to the ALJ. (Doc. 9, pg. 13). Evidence submitted after the administrative law judge's decision cannot be used to argue that the administrative law judge's decision is not supported by substantial evidence. Matthews v. Apfel, 239 F.3d 589, 594-95 (3d Cir. 2001). Such evidence can be considered to determine whether it provides a basis for remand under sentence 6 of section 405(g), 42 U.S.C. Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Under sentence 6 of section 405(g) the evidence must be "new" and "material" and a claimant must show "good cause" for not having incorporated the evidence into the administrative record. Id. The Court of Appeals for the Third Circuit explained that to be material "the new evidence [must] relate to the

time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id. In the present case, the additional evidence that Ficca submitted to the Appeals Council is not material.

The Government argues that even if the Court considers the evidence presented after the ALJ decision, the evidence would not change the ALJ's decision. (Doc. 9, pgs. 13-14). Ficca notes that he underwent rotator cuff surgery after the hearing. (Doc. 8, pg. 5) (Tr. 697-750). However, Government counsel notes that Ficca did well after his surgery. (Doc. 9, pgs. 13-14). An August 2010 CT revealed no significant neural foramen or central canal stenosis. (Tr. 596-97, 659-60, 693). Dr. Bogason stated that Ficca's hand weakness could not be explained by stenosis. (Tr. 694). Dr. Chaikhoutdinov stated that Ficca's mild C5-C6 disc bulge did not account for his weakness. (Tr. 655). Dr. Harbaugh found no signs of radicular pain and his right upper extremity pain was of unclear etiology. (Tr. 644-45). Thus, the Government argues that this evidence does not indicate that Ficca's condition satisfies Listing 1.04A. (Doc. 9, pgs. 13-14).

Ficca also states that he suffers from mental impairments that preclude hin from working. (Doc. 8, pg. 7). Dr. Dall, Ficca's treating psychiatrist, examined him and wrote three letters stating that Ficca's mental impairments prevent him from working. (Doc. 8, pg. 7) (Tr. 606-08). The ALJ reviewed Dr. Dall's opinions and noted that Dr. Dall did not address Ficca's past substance abuse. (Tr. 21). The ALJ further stated that Dr. Dall's letters regarding Ficca's inability to work are brief, lack detail, and are not supported by the evidence of record. (Tr. 23).

The Social Security regulations require that the applicant for disability insurance benefits

come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c). The ALJ reviewed the listings and gave an adequate explanation for finding that Ficca did not meet or equal the criteria of a listed impairment.

Ficca also argues that the ALJ erred in finding that his testimony was not credible. (Doc. 8, pg. 7). "[A]n [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). The ALJ observed and heard Ficca testify; therefore, the ALJ is the one best suited to assess his credibility. The ALJ stated that Ficca's statements that his pain prevents all work activity is not believable. (Tr. 22). The ALJ noted that Ficca runs and lifts weights and he testified that he can perform personal tasks and helps his parents around the house. (Tr. 22). The ALJ acknowledged that Ficca has right upper extremity problems, but that more recent diagnostic studies were essentially normal. (Tr. 22). Ficca had no symptoms regarding his cervical fusion, he did not see a neurosurgeon for two years, and evidence revealed that Ficca's low back pain subsided. (Tr. 22).

Upon review, the ALJ has not erred in determining that Ficca's condition does not meet the requirements of Listing 1.04A. Substantial evidence supports the ALJ's decision.

Ficca next argues that the ALJ erred in his residual functional capacity determination.[5] (Doc. 8, pgs. 12-15). Ficca argues that the ALJ ignored his testimony and the testimony of the vocational expert. (Doc. 8, pg. 13). Ficca cites his "rambling testimony" at the ALJ hearing as evidence of his inability to stay on task or concentrate. (Doc. 8, pg. 13). The vocational expert testified that if an individual could not concentrate for 20% of the workday or missed more than two days of work per month, they would not be able to sustain work. (Tr. 89-90). However, Government counsel argues that there is no evidence of record indicating that Ficca has these restrictions. (Doc. 9, pg. 21).

The Government argues that there is no medical evidence that supports Ficca's allegation that he is unable to concentrate or stay on task. (Doc. 9, pg. 20). The Government cites to evidence of record that Ficca's concentration and focus improved with medication therapy, he was cognitively intact, and Dr. Dall stated that Ficca could satisfactorily understand, remember, and carry out instructions. (Doc. 9, pgs. 20-21). The ALJ has not erred in determining Ficca's RFC and has considered his limitations in rendering the decision.

As part of step four of the sequential evaluation process, the administrative law judge must determine the claimant's residual functional capacity. Id.[6] Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475.

---

5. In his brief, Ficca states that the ALJ erred in determining that he could perform light duty work. (Doc. 8, pg. 12). The Court notes that this is likely a typographical error, as the ALJ determined that Ficca could perform a reduced range of sedentary work, not light duty work.

6. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

The ALJ determined that Ficca has the residual functional capacity to perform less than the full range of sedentary work.[7] (Tr. 16, 89). Specifically, the ALJ found that Ficca is capable of lifting and carrying up to twenty pounds occasionally and ten pounds frequently, and can stand, sit and walk for six hours in an eight hour workday. (Tr. 16). Ficca cannot do work that involves overhead work or reaching beyond arm's length with the right arm, he can only do occasional fingering and handling with the dominant right upper extremity, cannot work at unprotected heights or around dangerous machinery, and he is limited to simple, repetitive tasks with no production rate quotas and no contact with the general public. (Tr. 16).

Upon review of the administrative record, the decision of the Commissioner is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner

---

7. Sedentary work is defined in the Social Security regulations as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567 and 416.967.

will be affirmed.  An appropriate Order follows.

Date:  September 28, 2012

_____
**United States District Judge**